We'll begin with the first case to be argued, USA v. Al-Gaheim. Ms. Corbett. Good morning. I represent the appellant Ahmed Al-Gaheim. I will be addressing the errors in the jury instructions and the error in the denial of the mitigating role adjustment at sentencing. The district court's misguided supplemental instructions undermine the instructions as a whole, as those instructions related to the state of mind that was required to convict Mr. Al-Gaheim of the conspiracy to commit food stamp or SNAP fraud and the SNAP fraud itself. The supplemental jury instructions, instead of answering the questions and pointing the jury to the correct state of mind that was required for the conviction under the conspiracy and the actual substantive offense, instead took the specific intent required as the element of the state of mind that was required and replaced it with the general intent or just a voluntary action. The jury instructions as a whole and the supplemental jury instructions removed the mens rea required by allowing a voluntary act to stand in for what should have been done and a finding which should have been made based on purposefulness and deliberation. That is what was required by the elements of the offense for the conspiracy and the actual substantive offense under 2024B. You said the word deliberation is what must be in there? Not that deliberation must have been in there, but a deliberate act must have occurred. Well, he told them about knowingly, he told them about willfully. What didn't he tell them? He told them about knowingly and willfully and intentionally in the general state of mind instruction initially. In the first supplemental instruction, he simply referred them back to that general state of mind when their question was about a definition of voluntariness and voluntarily had no bearing within the knowingly and willfulness of the findings that were required under the elements and the specific element that they were looking at. Do you think it can be done knowingly and willfully but not voluntarily? It can be done knowingly, it must be done knowingly according to the Supreme Court case and it must be done willfully as well. Voluntarily is not a state of mind as was represented by the court when it gave it supplemental instruction. If a person acts knowingly and willfully, can they act without acting voluntarily? No. Well, then what's missing? What's missing is a confining instruction which would have defined for them as the law requires that they were required to find, not just knowingly, but that there was a knowledge of the law and of the prohibition that Mr. Algeheim was acting under. You mean must know the specific statute? They not must know the specific statute but must know that the act that they are undertaking is in violation of the law and of that statute. The supplemental instruction instead, the first supplemental instruction allowed or just pointed them to the general state of mind. The second supplemental instruction added to that error by not only prescribing to the jury that they could convict just on general states of mind instead of the specific intent required, but in addition added what it had referred to in its first supplemental instruction, an element. So at the end of its first supplemental instruction, the judge said, I'm not going to instruct you on voluntarily because I don't want to add an element that I haven't instructed on and I don't want to push you toward the verdict. And then subsequently, after it had informed counsel that it would instruct on voluntarily and it had told the jury that it wouldn't instruct on voluntarily, it instructed on voluntarily. So it had hinted to the jury that voluntariness was an element, and it had told the jury that if it instructed on voluntariness that it may push them toward a verdict, which is exactly what it did because within 29 minutes of receiving that instruction, they convicted. So not just the first supplemental instruction but the second supplemental instruction. The instructions as a whole were erroneous because what it did was it took what should have been a specific intent finding by the jury and undermined it by allowing them to convict simply based on a voluntary act. And not only did it take the specific intent requirement out of the elements that the jury was required to find, the state of mind element, but it also completely undermined the affirmative defense that Mr. Aldeheim had presented, that he did not have the requisite knowledge to have committed the crime, that he had not knowingly violated the snap offense because it didn't require them to find that he had knowledge. It just required him to find that he had acted. I think that if you examine the instructions as a whole, you will find that the instructions were completely undermined and that the findings that the jury made cannot assure this court that it found that he had acted with the intent required. Thank you, Ms. Fuller. Mr. Gutman? May it please the court, I'm appearing for Appellant Moffedal-Murched. Let me just note for the proverbial record that of course Judge Winter is with us from New Haven by video and I assume has been able to hear all of this? Good. Thank you. Our challenge to the sufficiency of the evidence focuses on the same intent element that co-counsel has raised issues about the charge concerning. With regard to the specific intent, which is specifically that Mr. Murched knew that he was obtaining snap benefits in a manner that was contrary to law or regulations, there was, we submit, no evidence that supports that inference of knowledge beyond a reasonable doubt. The government points to the fact that he was listed as the owner, but their own evidence from their own witnesses makes very clear that he was an owner in name only, that there was pretty much uncontested evidence that he had very limited English language skills, even speaking and even poorer skills needed to have things written in English translated for him. So not only was there no evidence that he had ever actually seen any of the training materials that the Department of Agriculture provides to participants in the SNAP program, there was evidence strongly suggesting that if he had seen those materials, he couldn't have comprehended them. The government relies on sort of, I would suggest, an unrealistic effort to place, to turn his nominal ownership into something significant by saying that the banking records and the overall discrepancies between the sales of tax-exempt food and the use of the EBT cards, that there was a discrepancy, but how that can be attributed to him on this record, we submit as a stretch that goes beyond the legal requirements. There was no evidence that he, in fact, profited from anything he did, and the evidence, again, uncontested, or at least for the most part uncontested, from the government's own witnesses is that when he did the transactions, he was being told by a co-defendant exactly how much money to give based on a swipe of the EBT card. The government cites cases in which owners are held, there's an inference of knowledge because of the manner in which the transactions were structured, but again, none of those cases apply to a person like this who, the evidence makes clear, was an uneducated, I'm not sure that the evidence before the jury said how recently he had immigrated, but it did make clear that he was simply a clerk in a store who was doing what he was told. The government also makes a great deal of an instance when he was observed bringing a paper bag which possibly, although not even conclusively from the testimony, had money in it, and the government wants to pair that with evidence that another defendant had used someone's EBT card to make purchases at a Walmart and needed to repay that person, but there was absolutely no evidence that Mr. Machete did anything other than retrieve the bag. There was no evidence that he knew about the transactions at Walmart, that he knew what the purpose of the money was. So again, we believe that this is insufficient to establish guilt. I'd also just very briefly mention that the same factors also throw into question the reasonableness of the sentence, which was driven almost entirely by the amount of loss, even though there was no profit and no planning on Mr. Machete's part. Thank you. You've reserved some time, and we'll hear from Mr. Silver. May it please the court, I think it's apparent from the record that the jury instructions, the main jury instructions that the district court gave are fairly characterized as having been replete with references to the necessity that the defendants acted willfully, that is, with an awareness that what they were doing was wrong under either law or regulation. The supplemental instruction in response to the jury's question about the meaning of voluntarily, as far as I can tell and as I submit to the court, did nothing to undermine the court's instructions on the necessity of willful conduct. In fact, Judge Newman, as you were asking earlier, the court in its instructions regarding voluntariness did not omit the necessity of willfulness or knowledge. So I quite frankly am at a loss to understand the argument that the addition of a requirement that the defendant acted voluntarily caused the jury to disregard all the instructions throughout the charge and in conjunction with the voluntariness discussion regarding willfulness. What about Mr. Gutman's argument about his client's lack of command of the English language? I think that's something that the jury was entitled to consider to the extent that was in the record. But I don't think it's fair for Mr. Murchad to be arguing that even if in fact he may be a nominal owner of the business, all of the evidence in front of the jury was he was the owner. He held himself out as such when the USDA wanted to inspect the store to determine its eligibility to engage in the SNAP program. Mary Ann Mackus was an employee of the store. She testified that Murchad was an owner or a boss in the store. Mr. Murchad signed tax returns. Bank statements were in his name. All the indicia was if he wasn't the owner, he held some position higher than a run-of-the-mill clerk, if you will. And with respect to the sufficiency of the evidence against Mr. Murchad, I think that plays in in a large way. I do believe that a reasonable jury was entitled to conclude that the way these transactions occurred gave rise to a permissible inference that the defendants had the requisite mens rea. Swiping an EBT card in amounts that I would argue a reasonable jury could conclude were intended to disguise the nature of the transaction by putting in something other than round numbers. Swiping for $99.86, for instance, arbitrarily, I don't know if that was in the record, to give back $50 in cash. All designed, all give rise to a permissible inference that a reasonable jury could rely on in determining that a defendant had the requisite mens rea. In particular, I think the episodes of the informants, quote-unquote, going shopping at the Walmart, and in particular the incident that's been discussed here with respect to the paper bag. The circumstances surrounding Mr. Murchad going to the apartment while the informant was in the store, returning with a brown paper bag, the informant's recollection that she was paid with cash that came from a brown paper bag, although she didn't recall who brought the paper bag to the store, certainly gives rise to a permissible inference that it was Mr. Murchad who returned with that money. What's so unusual about the going shopping episodes, I would submit to the court, is these are instances where the defendants are using the SNAP benefits to buy goods, not to sell goods. The informant is taken to the Walmart or whatever store is involved, purchases these goods, and then these defendants buy those goods from the defendant. Certainly, with the background of the program that was testified to in front of this jury, a juror could conclude that that activity signified that the defendants knew their conduct was impermissible. Do you have a lot of these cases in your district? No, I would not say a lot. Not that I've seen them, Your Honor. No. Well, this isn't the only one, right? No, I know we've seen them. I recall them from many years ago. This is actually the first one in recent memory for me, Your Honor, but I honestly don't know. Do you have any idea of the range of sentences in these cases? I don't, Your Honor. I apologize. This one was driven by the loss amount, is that right? In some measure. Well, yes. For these two defendants, the base offense level was added. There was a base offense level and then a specific offense characteristic based on loss amount. That's determined pretty much, isn't it, by just how long the investigation goes on? If it had gone on three more months, the loss would have been bigger, right? Yes and no, Your Honor. Tell me the no. Yes for everything you said, but I think Judge McEvoy was eminently fair in how he determined the loss amount for any particular defendant. He limited the loss amount for defendants based on the time that they actually were there when this total loss amount was determined. Right. If they were there four more months and the investigation continued, the loss would have been bigger. Yes. And they would have gotten more time. Yes. I think that's probably correct. Certainly their guideline level would have been increased if some threshold amount was reached that caused an increase in the specific offense characteristic value, if you will. So this is one of the oddities of the guideline. The punishment varies with how long the investigator keeps the file alive. It could. Isn't that troublesome? Well, I mean, the guidelines now, as we know, are one factor. The court considered all the factors under 3553A. But he didn't impose a non-guideline sentence. He did not. With Mr. Algaheim, he imposed the bottom of the range, and with respect to Mr. Mershad, he imposed the middle of the range. Thirty months seems like an awful lot. Now we're talking about the substantive unreasonableness claim. Well, this court, I believe, as well as the Supreme Court, has recognized that the guidelines are the best amalgamation, if you will, of the 3553A factors. We have? We've said they're the best? I believe that's true. How can you ever say that? I apologize. You're right. I'll say, if you haven't— They have said they're the worst. If you haven't said it, Your Honor, as a court, I know I can say that the Supreme Court has said it. Oh, okay. So it's a starting point. That's the best starting point for determining a sentence. So, you know, the court indicated that it— Is this a proverbial first offense? Yes, but that's reflected in the guideline calculation. Yeah, I understand. I'm just trying to get a sense of the reasonableness of 30 months. I don't mean to be flipped with the court. It all depends if you're buying or selling. So, for instance, Mr. Merchand would say that I was only in the country for a short period of time before I got into this, et cetera. Well, as we've argued in our brief, that could just as easily be an aggravating circumstance. You know, you get here and right away you're engaged in this criminal conduct. So Mr. Merchand argued to the court, obviously, that deportation may be a consequence of this conviction, which will have an impact on his family. The court considered that, said that it had considered that in determining an appropriate sentence. So whether the court may consider it a harsh sentence under the circumstances, I would submit it does not in any way shock the conscience. With respect to either of these two defendants and the sentences they received, which obviously is necessary to find the sentence unreasonable. Unless the court has any comments. Did they say anything in sentencing? I'm sure they did. I'm sure. I suspect we.  I did not try the case. 99% of the time, Your Honor, we do seek sentences within the guideline range. It's probably very rare that we would ask for a sentence below the guideline range, obviously. But on occasion, we do seek upward departures, and I'm sure that didn't happen here. Thank you, Your Honor. Ms. Corbett, you've reserved one minute. Just very quickly, I would direct the court's attention to the two cases that are cited in Kopstein, which is cited in my brief as being almost directly on point as to what happens when a judge supplements the jury instructions and doesn't specifically tie them back to the original jury instruction. What is the element, the state of mind element that's required? In addition, the general jury instructions referred on multiple occasions to acts as being equated to or as able to determine a finding of intent. So the judge instructed, Rarely is direct proof available to establish a person's state of mind. Rather, a person's state of mind may be inferred from what he does at the time of the occurrence. These references to acts equating to or being a basis for finding of intent are replete throughout the instruction. I would submit that the supplemental instructions undermined the fact that the state of mind necessary was knowing and willfulness and not just a voluntary act. And in doing so, they undermined the defendant's defense. I would also ask the court to fully examine the totality of the circumstances that underlie the sentencing and the determination of the mitigating role. Thank you. Can you help us on the question of substantive unreasonableness? Is there anything that could guide us in determining whether the sentence imposed on your client was substantively unreasonable? Well, this was a first-time offense for Mr. Alderheim. His criminal history category was one. He was a sole provider for his son. He lived in an impoverished situation. He barely spoke English. He had only been working for the store in a minimal role as a cashier. He didn't participate in the shopping expeditions and the obtaining of the actual cards from the recipients to then go shopping to other stores to then restock the D&D store itself. The lower end of the guideline, the guideline was driven by an amount that the district court determined that he was responsible for, but not just he himself. He was held jointly and severally responsible with the other three co-defendants. If the court had found that he was solely responsible if you had divided up the amount that they found, which was $130,000 approximately, he would have only been responsible for approximately $30,000. The majority of the amount of that loss occurred toward the tail end of the actual conspiracy when they were ratcheting up the amounts that they were charging, the SNAP benefit. Could you turn to Judge Newman's question that Mr. Silver didn't have a complete answer to? You probably have a better idea, or your office does, as to how frequently these cases come up in the Northern District. These cases come up very infrequently in our office. We don't see a lot of these cases. In fact, the . . . Is there any theory under which one would understand why this case surfaced? This case arose, I believe, because a Walmart employee reported one of the informants as using her SNAP benefit card improperly at Walmart, and then she was approached by the local law enforcement officers who then contacted the USDA officials, and they set up this sting operation. Mr. Goodwin? To respond to Judge Newman's question about the prosecutor's remarks at sentencing, it's pages 17 and 18 of our appendix, and specifically the government pointed to the fact that Merched is the owner and spoke as if he had profited from the total amount of the transactions done at the store. I submit that that is really blinking at the reality that was before the sentencing court about what his real role was. I also believe that it's not reasonable for a judge to take the factor of being a recent immigrant and turn that into a negative because, how dare you come here and start committing crimes. I think a reasonable . . . Is it your view that that's what Judge McAvoy said? Well, he did. I think if you look another page or so beyond that in our appendix, he did say words to that effect. And in response to another question, I believe what the Second Circuit has said, and I can't think of the case, although I would submit it if the court wants me to, but I believe the court has said the guidelines, ordinarily a guideline sentence is a reasonable sentence, but there's no presumption to that effect. And in this case, I think if you look at the reality that the guidelines included a 12-level increase based on an amount of money which did not go to Mr. Merched, that Mr. Merched did not create the circumstances that led to there being that amount of loss . . . The loss enhancement was 12 levels? It was, Your Honor. Have you calculated what it would have been without that enhancement, what the sentence would have been, what the range would have been? Well, I mean, it would be a base offense level of six, which would not necessarily involve jail time at all. Maximum six months? Yes. Right, zero to six. And I really think it's very hard to distinguish why . . . Had this, in fact, been the owner and the designer of the criminal scheme, a 30-month sentence would be very likely what you would expect to see in that case. So the notion that there's no . . . it doesn't factor in in a way that reduces the sentence to look at the reality of who this person is and what his level of understanding was, I do think raises serious concerns for the Court. Thank you. We'll reserve the . . .